UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TIMOTHY E. KELLY, | |
| Plaintiff, | Case No. 3:17-cv-01597 |
| v. | Judge Aleta A. Trauger |
| | Magistrate Judge Alistair E. Newbern |
| DINA KULENOVIC, et al., | |
| Defendants. | |

To:    The Honorable Aleta A. Trauger, District Judge

### REPORT AND RECOMMENDATION

Pro se and *in forma pauperis* Plaintiff Timothy E. Kelly has suffered from mental illness and suicidal tendencies since childhood. (Doc. No. 1.) This action concerns the treatment Kelly received for his mental illness while incarcerated at the Riverbend Maximum Security Institution (RMSI) in Nashville, Tennessee, and the Morgan County Correctional Complex (MCCC), in Wartburg, Tennessee. (*Id.*) Kelly alleges that, in 2017, RMSI Clinical Director Defendant Dr. Dina Kulenovic ignored his mental health illness and that, after he was transferred to MCCC, Mental Health Supervisor Defendant Amanda Hinds placed him in supermax confinement despite knowing that it would be detrimental to his mental health. (*Id.*) Kelly brings claims against those defendants and others under 42 U.S.C. § 1983 for deliberate indifference to his medical needs in violation of the Eighth Amendment. (Doc. Nos. 1, 6, 7.)

Now before the Court are a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) filed by Hinds (Doc. No. 35); a motion for judgment on the pleadings filed by Dr. Kulenovic and Hinds (Doc. No. 37); a motion for judgment on the pleadings filed by Kelly,

which the Court construes as a response to Dr. Kulenovic and Hinds's motion (Doc. No. 42); and a motion for summary judgment filed by Dr. Kulenovic and Hinds (Doc. No. 48). For the reasons that follow, the Magistrate Judge will recommend that Dr. Kulenovic and Hinds's motion for summary judgment (Doc. No. 48) be granted and that the parties' motions for judgment on the pleadings (Doc. Nos. 35, 37, 42) be found moot.

## I. Background

### A. Undisputed Facts[1]

#### 1. Incarceration at RMSI in 2015 and 2016

Kelly suffers from mental illness and has self-mutilated since he was seven years old. (Doc. Nos. 1, 45-1.) He has received psychiatric treatment at Vanderbilt University Medical Center and the Mental Health Cooperative in Nashville, Tennessee. (*Id.*) In October 2015, Kelly was

---

[1] These facts are based on the allegations of Kelly's complaint (Doc. No. 1); Dr. Kulenovic and Hinds's statement of material facts (Doc. No. 50), which are taken as undisputed under Local Rule 56.01(f) because Kelly failed to respond to them, *see* M.D. Tenn. R. 56.01(f) (failure to respond); Kelly's grievances and the responses to them, filed with the briefing of Dr. Kulenovic and Hinds's motion for judgment on the pleadings and subsequent motion for summary judgment (Doc. Nos. 38-1, 45-1, 49-1–49-3); and Kelly's treatment records from RMSI and MCCC (Doc. No. 49-6) and the relevant grievance and mental health care policies (Doc. Nos. 49-4, 49-5), which Dr. Kulenovic and Hinds filed in support of their motion for summary judgment. Kelly's complaint was not sworn under penalty of perjury and therefore is not considered as evidence in resolving the defendants' motion for summary judgment. *See Evans v. Frantz*, No. 4:16-cv-5, 2018 WL 1122133, at \*2 (N.D. Ohio Mar. 1, 2018) (noting that proper verification generally requires "an assertion that the statements are true and correct, and an averment that the facts are made under penalty of perjury"); *see also Berri v. Dearborn Pub. Sch.*, 103 F. Supp. 3d 855, 858 n.1 (E.D. Mich. 2015) (finding that, because plaintiff's complaint was not verified or sworn under penalty of perjury, it did "not constitute evidence the Court can consider on summary judgment); *cf. Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) (holding that pro se plaintiff verified his complaint by swearing under penalty of perjury that its content were true and correct). It is referenced in this report only to provide factual context.

incarcerated at RMSI. (Doc. No. 45-1.) At that time, Kelly was classified as being at mental health level of care (LOC) II under Tennessee Department of Correction (TDOC) Policy # 113.87, which sets five levels of mental health care for people incarcerated in its facilities.[2] (Doc. No. 49-2; Doc. No. 49-5; Doc. No. 50.) A person classified as LOC I does not need mental health services and can function without impairment in the general population of the prison (Doc. No. 49-5), while a person classified at LOC V requires the most intensive remedy of "Crisis Stabilization Placement[,]" (*id.* at PageID# 277). LOC II provides for outpatient services that

> are indicated when an inmate's ability to function in general population is mildly impaired due to mental illness and/or mental retardation or if the inmate is not currently impaired but he/she needs monitoring due to:
>
> a. A recent discontinuation of psychotropic medication
>
> b. A recent discharge from either a supportive living unit (SLU), or crisis stabilization placement
>
> c. A recent history of self-injurious behavior or suicidal ideation[.]

(*Id.* at PageID# 272.)

On June 24, 2016, Kelly filed a grievance stating that, since his arrival at RMSI, he had "been having days of extreme depression [and] episodes of cutting to the point of almost death"

---

[2]     The policy that the defendants filed in support of their motion for summary judgment became effective August 1, 2018, which is after the time period relevant to this action. (Doc. No. 49-5.) However, because the parties appear to agree that this is the policy that was in effect at RMSI and MCCC while Kelly was incarcerated at those facilities, the Court may assume the same. *See Green v. Doe*, No. 16-cv3945, 2018 WL 1023784, at *3 n.8 (D. Minn. Jan. 29, 2018) (noting that, although cited prison "policy was not in effect at the time of the 2016 incident," the court would assume, "consistent with [plaintiff's] Amended Complaint, that a similar policy was in effect at the time"), *report and recommendation adopted by* 2018 WL 1015343 (D. Minn. Feb. 22, 2018); *see also Bradford v. Owens*, No. 3:11-cv-P488, 2016 WL 7015662, at *12 n.3 (W.D. Ky. Nov. 29, 2016) (considering correctional facility's policies and order relating to medical care even though they became effective outside the relevant time period where correctional defendants had not contested their relevance).

3

because he was allowed out of his cell for no more than two hours each day.[3] (Doc. No. 45-1, PageID# 212.) Kelly also stated that he had been receiving treatment for bipolar disorder. (Doc. No. 45-1.) Kelly quoted language from the section of Policy # 113.87 that describes supportive living unit (SLU) placement for people classified as LOC III: "Inmates should be engaged in therapeutic programming a minimum of 4 hours per day. This programming may include: work, education, structured therapeutic activities or programs, individual or group therapy and/or psychiatric/psychological appointments." (*Id.* at PageID# 212; Doc. No. 49-5, PageID# 275.) Kelly complained that RMSI was not following this policy, which, he claimed, entitled him to a minimum of four hours of therapeutic programming a day. (Doc. No. 45-1.) In the "requested solution" section of his grievance, Kelly asked that RMSI adhere to Policy # 113.87 by providing him with the required hours of programming. (Doc. No. 49-2, PageID# 247.) On June 24, 2016, Kelly received an inappropriate grievance notification, informing him that, per TDOC Policy # 501.01, "grieving a diagnosis by medical professional or medical co-pay is inappropriate" but that the grievance would be forwarded to Defendant RMSI Mental Health Director Mark Collins for a response. (Doc. No. 17, PageID# 85.)

Collins responded on June 29, 2016. (Doc. No. 49-2.) Collins wrote that, "[a]t the time [Kelly] was receiving [the] 4 hours of therapeutic programming to which he refers he was a mental health [LOC III], and RMSI at that time did have a mental health [LOC III] sheltered living unit and mental health programming that he did participate in" (*id.* at PageID# 249)—implying that Kelly had been incarcerated at RMSI previously and that RMSI no longer had a LOC III sheltered living unit. According to Collins, Kelly had been reclassified as LOC II in March 2015 while he

---

[3]    Because the copy of this grievance filed by the defendants is almost completely illegible (Doc. No. 49-2), the Court cites the legible copy filed by Kelly (Doc. No. 45-1).

was incarcerated at the West Tennessee State Penitentiary and maintained that classification when he arrived at RMSI in October 2015.[4] (Doc. No. 49-2.) Collins reassured Kelly that he had "been discussed multiple times during weekly treatment team meetings . . . to ensure he was at the appropriate mental health [LOC] . . ." and that Clinical Director Dr. Adler would be reviewing Kelly's LOC classification. (*Id.* at PageID# 249.)

Kelly appealed that response through the three levels of RMSI's grievance system. (Doc. No. 49-4.) At the second level of review, the grievance chairman explained that no hearing was held on Kelly's grievance because "[g]rieving a diagnosis by a medical professional or medical co-pay is inappropriate" under TDOC Policy # 501.01. (Doc. No. 49-2, PageID# 250.) The chairman also concurred with Collins's response. (Doc. No. 49-2.) Kelly appealed the chairman's decision to the third and final level, where the commissioner also concurred with Collins's response. (*Id.*)

On June 30, 2016, Kelly filed another grievance related to his mental health care.[5] (Doc. No. 49-3.) Kelly wrote that the "[h]eavy" dose of medication he took in the evening was making it difficult for him to stand or sit up in the morning to be counted by corrections officers, and he was concerned that this would lead to disciplinary action against him. (*Id.* at PageID# 253.) Collins responded that, although "TDOC calls for the standing/sitting counts[,]" "RMSI Mental Health can provide a memo asking the Unit Management Team to take into consideration the drowsiness side effect from certain medications prior to disciplinary action being taken." (*Id.* at PageID# 255.) Collins also stated that Kelly's drowsiness was "a common side effect of his prescribed

---

[4]     Collins's reference to "WTSP" is assumed to be a reference to the Western Tennessee State Penitentiary. (Doc. No. 49-2, PageID# 249.)

[5]     Although Kelly signed this grievance on June 30, 2016, it was not posted and received by the grievance clerk until July 12, 2016. (Doc. Nos. 49-1, 49-3.)

psychotropic medication(s)." (*Id.*) Kelly appealed that response and the grievance committee again declined to hold a hearing, citing the policy that "[a] diagnosis by medical professional & medical co-pay is inappropriate" to the grievance process. (*Id.* at PageID# 256.)

On August 22, 2016, RMSI Grievance Chairperson McClure wrote Kelly a letter regarding his "Unprocessed Grievance(s)[.]"[6] (Doc. No. 17, PageID# 84.) The chairperson stated that an unspecified grievance in which Kelly complained that he was "not receiving the correct care from mental health supervisors" was being returned to him because it was "the same as or similar to" the June 24, 2016 grievance that had "been addressed by Mark Collins and reviewed by Dr. Andrew Adler." (*Id.*) The chairperson further explained that "[g]rieving a medical diagnosis is inappropriate to the grievance procedure" and that "[t]he grievance board cannot review, decide on, or make recommendations in regards to any medical related grievance." (*Id.*) The chairperson informed Kelly that he should "consider this issue resolved" and that he could "use [his] previous grievance and this unprocessed grievance as evidence that [he had] exhausted [his] state remedies." (*Id.*) Finally, the chairperson noted that Kelly had not continued to pursue his June 30, 2016 grievance, and that, if Kelly did not respond to the grievance committee's inquiries concerning that grievance, it would "be resolved due to failure to participate in the grievance process." (*Id.*) Kelly "did not return for [the] appeal" of the June 30, 2016 grievance, which was resolved at level two on August 26, 2016. (Doc. No. 49-3, PageID# 256; Doc. No. 50.)

### 2. Incarceration at RMSI in 2017

On January 2, 2017, Dr. Kulenovic—then RMSI's clinical director—had an appointment with Kelly, who reported that he was not consistently taking his medications because he was

---

[6]      Kelly does not directly reference this letter in his summary judgment response. The Court considers it as "other materials in the record" under Federal Rule of Civil Procedure 56(c)(3).

occasionally having trouble waking up. (Doc. No. 49-6.) Dr. Kulenovic wrote that she would inform the psychiatrist and advanced practice nurse (APN) so that they could consider an adjustment to Kelly's medication.[7] (*Id.*)

A week later, Dr. Kulenovic attempted to screen Kelly for a thirty-day period of segregation.[8] (*Id.*) Dr. Kulenovic deferred the assessment after Kelly refused to be interviewed by her in the presence of a guard. (*Id.*) Kelly "was encouraged to make [a] sick call request for [mental health] services if he felt he needed to speak [with] someone [regarding mental health] concerns." (*Id.* at PageID# 286.)

On February 14, 2017, after Kelly reported "being a threat to himself," Collins placed him on suicide watch. (*Id.* at PageID# 287.) When Dr. Kulenovic reassessed Kelly the next day, she noted that he "reported feeling stressed" and having "thoughts of self[-]harm." (*Id.*) Kelly also expressed "ongoing frustration [with] staff, including [Dr. Kulenovic], after which he slid a piece of bologna [and] feces under his door." (*Id.*) Dr. Kulenovic continued the suicide watch. (Doc. No. 49-6.) On February 16, 2017, an APN visited Kelly. (*Id.*) Kelly stated that he had given up "his blade" the day before and that, although he was frustrated, he did not want to die. (*Id.* at PageID# 287.) The APN placed Kelly in seclusion. (Doc. No. 49-6.) When the APN saw Kelly again two days later, Kelly requested therapy, stating that there were "[m]any issues he want[ed] to discuss[.]" (*Id.* at PageID# 288.) The APN referred Kelly for additional mental health services. (Doc. No. 49-6.)

On the morning of February 20, 2017, Dr. Kulenovic noted that Kelly would be transferred to the infirmary and that he would be seen by mental health staff that day. (*Id.*) A few hours later,

---

[7]     Dr. Kulenovic is a Doctor of Psychology. (Doc. No. 49-6.)

[8]     The record does not establish why Kelly was being placed in segregation.

Kelly cut himself and threatened to do so again. (*Id.*) Kelly had a one-inch cut on his arm and his cell window and walls were "smeared with blood[.]" (*Id.* at PageID# 289.) Kelly was again placed on suicide watch. (Doc. No. 49-6.) Later that day, Dr. Kulenovic and an APN reassessed Kelly. (*Id.*) Kelly stated that he was still experiencing thoughts of self-harm and that he had a razor. (*Id.*) However, he also "denied having a plan to" harm himself. (*Id.* at PageID# 289.) Dr. Kulenovic and the APN maintained Kelly's placement on suicide watch. (Doc. No. 49-6.)

By March 5, 2017, Kelly had been taken off suicide watch and returned to his cell. On that date, Kelly reported that he was "depressed and . . . always thinking of killing himself." (*Id.* at PageID# 290.) He also reported that he had "used [his] nail" to cut himself. (*Id.*) Kelly was returned to suicide watch and immobilized with four-point restraints. (Doc. No. 49-6.) Later that day, after Kelly had taken his medications, he reported that he had "been sleeping off and on, eating well, and doing 'okay[,]'" although he was experiencing visual hallucinations. (*Id.* at PageID# 290.) Kelly denied feeling an impulse to harm himself and the four-point restraints were removed. (Doc. No. 49-6.) Dr. Kulenovic reassessed Kelly that evening. (*Id.*) She noted that, although Kelly continued to report experiencing visual hallucinations, he appeared oriented, maintained eye contact, and was actively engaged. (*Id.*) Dr. Kulenovic ended the assessment when she observed that Kelly was masturbating while talking to her. (*Id.*) Dr. Kulenovic continued the suicide watch. (*Id.*)

On March 20, 2017, Kelly filed a grievance accusing Dr. Kulenovic of having a conflict of interest and engaging in "racist discrimination" in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (Doc. No. 38-1, PageID# 184; Doc. No. 50.) Kelly's grievance appears to be based on his belief that Dr. Kulenovic was biased against him because she had a connection to the victim of the crime of which Kelly had been convicted. (Doc. No. 38-1.) Kelly

also accused Dr. Kulenovic of discrimination on the grounds that he had seen "several inmates of other rac[e]s with the[ir] property [in] the short hall[,]" implying that he had been denied his property because of his race.[9] (*Id.* at PageID# 183.) At level one of the grievance process, Kelly's grievance was found not to implicate Title VI. (Doc. No. 38-1.) Kelly appealed that decision through all three levels of the grievance process. (*Id.*) At the third level, the deputy commissioner of operations concluded that "[t]he circumstances surrounding the alleged incident do not substantiate a Title VI Violation" and denied Kelly's appeal. (*Id.* at PageID# 191.)

On March 28, 2017, Kelly wrote a letter to Dr. Kulenovic that he labeled a "written complaint."[10] (Doc. Nos. 17, 45-1.) Kelly summarized his history of mental illness and self-mutilation and described two incidents of cutting that occurred while he was incarcerated on April 22, 2014, and on January 26, 2016. (Doc. No. 45-1, PageID# 213.) In both incidents, Kelly mutilated himself until he bled and was disciplined by prison authorities. (Doc. No. 45-1.) Kelly explained that Dr. Kulenovic's predecessor, presumably Dr. Adler, had refused to classify Kelly as LOC III, depriving Kelly of therapy and treatment for five months.[11] (Doc. No. 17.) Kelly wrote that he had been having serious episodes of mental illness and accused Dr. Kulenovic of repeatedly ignoring the Unit 4 therapist's request that Kelly's LOC "be raised to a[ ] three[.]" (*Id.* at

---

[9]      Although Kelly's race is not established by the record, a search of TDOC's Felony Offender Information site reveals that Kelly is Black. TDOC, *Felony Offender Information*, https://apps.tn.gov/foil-app/search.jsp (last visited Feb. 18, 2020).

[10]      There are two incomplete copies of this letter in the record, one missing the fifth page (Doc. No. 45) and the other missing the sixth (Doc. No. 17). Accordingly, both copies are referenced here.

[11]      It is not clear from the record when Dr. Kulenovic became RMSI's clinical director. However, Collins's response to Kelly's June 30, 2016 grievance shows that Dr. Adler was the clinical director at that time. (Doc. No. 49-2.)

PageID# 90.) Kelly concluded the letter by asking Dr. Kulenovic to take his complaint seriously and "follow the proper procedures[.]" (Doc. No. 45-1, PageID# 217.)

Dr. Kulenovic saw Kelly again on April 14, 2017. (Doc. No. 49-6.) Dr. Kulenovic found that Kelly exhibited appropriate affect; that his thought processes were orderly and relevant; that his perception processes were intact; that he was oriented as to person, place, time, and circumstance; that his memory processes were intact; and that his judgment and insight were within normal limits. (*Id.*) Kelly was no longer experiencing visual hallucinations, and he "denied difficulties [with] sleep or appetite." (*Id.* at PageID# 291.) Kelly reported that "he was 'doing fine for now'" and "denied any other [mental health] concerns . . . ." (*Id.*) He stated that, although he had "not yet utilized rec time since returning to the Unit, . . . he [might] in the future." (*Id.*) He further stated that he planned "to continue participating in individual therapy." (*Id.*)

On June 1, 2017, Dr. Kulenovic saw Kelly in the infirmary, where he had been placed for therapeutic seclusion. (Doc. No. 49-6.) Kelly reported that he was "doing fine," and he did not "appear to be in any overt psychological distress." (*Id.* at PageID# 292.) Dr. Kulenovic found that Kelly exhibited "psychiatric stability" and that "[h]is insight [and] judgment with regard to his current treatment needs and placement status [were] both fair[.]" (*Id.*) Dr. Kulenovic concluded by noting that Kelly was awaiting transfer to MCCC because he had recently been classified as LOC III. (Doc. Nos. 49-6, 50.)

Various corrections officials monitored Kelly at regular intervals from June 8, 2017, through June 12, 2017, while Kelly was in therapeutic seclusion. (Doc. No. 49-6.) Roughly every thirty-minutes, an official observed Kelly's behavior and recorded the activity code associated with it in a monitoring report. (*Id.*) The most common code recorded during this time indicates quietness, although officials also observed restless pacing, incoherence, talking, and sleeping. (*Id.*)

### 3.       Transfer to MCCC

Kelly was transferred to MCCC in August 2017. (Doc. Nos. 1, 49-6.) Dr. Emily R. Olroyd saw Kelly on August 18, 2017, three days after he had been admitted to the MCCC infirmary. (Doc. No. 49-6.) Dr. Olroyd recorded that Kelly was a "recent transfer from RMSI" who "did not want to be in [MCCC's] SLU" because he felt it would "be detrimental to his mental state." (*Id.* at PageID# 295.) Kelly stated that "he shouldn't be locked down" and that he "wanted more freedom." (*Id.*) Dr. Olroyd encouraged Kelly to talk to other inmates about the SLU program and to give it a chance before making up his mind. (Doc. No. 49-6.) Kelly said that he would. (*Id.*) Dr. Olroyd noted that Kelly "was calm and appropriate[,]" although he "did exhibit serious thought distortions." (*Id.* at PageID# 295.) Kelly "denied suicidal and homicidal ideations and did not appear to be responding to internal stimuli." (*Id.*) Dr. Olroyd concluded her report by noting that Kelly would continue to be monitored as required by SLU policy. (Doc. No. 49-6.) There is no other evidence concerning Kelly's incarceration at MCCC in the record.

### B.       Procedural History

Kelly initiated this action while incarcerated at MCCC on December 21, 2017, by filing a complaint under 42 U.S.C. § 1983. (Doc. No. 1.) Kelly alleges that, while he was incarcerated at RMSI in 2017, he "experience[ed] extreme episodes of schizophrenia" in which he would "blank out," "lose [his sense] of reality," and "self mutilate repeatedly" by cutting his left and right arms until he was bleeding heavily. (*Id.* at PageID# 2.) Kelly states that he was not referred to a doctor or transferred to an "institution like [the] Lois M. De[B]erry Special Needs Facility" and was instead "placed in four[-]point restraints[.]" (*Id.*) Kelly accuses Dr. Kulenovic of ignoring his condition and alleges that Collins refused to provide Kelly with the level of care requested by the mental health therapist assigned to Unit 4. (Doc. No. 1.)

Kelly alleges that he was transferred to MCCC because he filed too many grievances and that he experienced "harsh supermax confinement" at MCCC consisting of twenty-four-hour lockdown inside his cell or twenty-three hours of lockdown and one hour of recreation. (*Id.* at PageID# 3.) According to Kelly, his confinement violated TDOC Policy # 113.87, which entitled him to at least four hours of group therapy per day. (Doc. No. 1.) Kelly alleges that Hinds, MCCC's mental health supervisor, forced him to live in those conditions despite her awareness that the SLU was not suitable for him. (*Id.*) Kelly further alleges that Shawn Phillips, who was then MCCC's warden, violated Kelly's rights by allowing such conditions in the facility. (*Id.*) Kelly's complaint names Collins, Dr. Kulenovic, Hinds, and Phillips as defendants and seeks damages for violation of the Eighth Amendment and the Americans with Disabilities Act. (*Id.*) Kelly also seeks transfer to a facility that is capable of adequately treating his mental illness. (*Id.*)

The Court granted Kelly's application to proceed *in forma pauperis* (Doc. Nos. 3, 7) and reviewed his complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A (Doc. No. 6). The Court found that Kelly had stated colorable claims against the defendants under the Eighth Amendment for deliberate indifference to his mental health needs but dismissed all of Kelly's other claims. (Doc. Nos. 6, 7.) Summonses issued to the defendants on April 12, 2018. (Doc. No. 8.) Dr. Kulenovic and Hinds answered the complaint (Doc. Nos. 11, 12). The summons for Collins was returned unexecuted with the notation that he is deceased. (Doc. No. 14.) The Court will address this issue by separate order.

Phillips responded to the complaint by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (Doc. Nos. 20, 21), to which Kelly responded in opposition (Doc. No. 26). The Magistrate Judge recommended that Phillips's motion be granted and that Kelly's

claims against him be dismissed with prejudice. (Doc. No. 30.) The Court adopted the report and recommendation and those claims were dismissed. (Doc. No. 31.)

Hinds filed a motion for judgment on the pleadings under Rule 12(c) on April 22, 2019, arguing that Kelly's claim against her should be dismissed because Kelly failed to allege any injury as a result of her treatment. (Doc. Nos. 35, 36.) Two months later, Hinds filed another motion for judgment on the pleadings, this time with Dr. Kulenovic, arguing that Kelly's claims should be dismissed because he failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a). (Doc. Nos. 37, 38.)

On July 8, 2019, the Court found that Kelly had failed to timely respond to Hinds's initial motion for judgment on the pleadings and ordered him to show cause by July 29, 2019, why his claims should not be dismissed for failure to prosecute. (Doc. No. 39.) On September 17, 2019, Kelly filed a motion for an extension of time to respond to the Court's show-cause order, explaining that he was incarcerated at the DeBerry Special Needs Facility in Nashville and was unable to timely respond to the Court's order because he had been on suicide watch from January through June. (Doc. No. 40.) The Court granted Kelly's motion and ordered him to file any response by October 16, 2019. (Doc. No. 41.) On October 7, 2019, Kelly filed a motion for judgment on the pleadings, which the Court construes as a response to the defendants' motions. (Doc. Nos. 42, 43.) Kelly also filed a motion asking the Court to consider various documents relating to his efforts to exhaust his administrative remedies. (Doc. No. 45.)

The Court found that Kelly had adequately shown cause why his claims should not be dismissed for failure to prosecute and that it would consider Kelly's untimely response to the defendants' motions for judgment on the pleadings. (Doc. No. 47.) The Court also notified the parties that it would treat Dr. Kulenovic and Hinds's motion for judgment on the pleadings as a

motion for summary judgment under Rule 12(d), given the parties' extensive reliance on documents outside the pleadings in briefing whether Kelly has adequately exhausted his deliberate indifference claims. (*Id.*) The Court allowed the parties to file any additional briefing and evidence required by the conversion of the motion to one for summary judgment. (*Id.*) Kelly's motion asking the Court to consider various documents related to exhaustion was found moot. (*Id.*)

Dr. Kulenovic and Hinds then filed a motion for summary judgment (Doc. No. 48), supported by a memorandum of law (Doc. No. 49), a statement of undisputed material facts (Doc. No. 50), and various exhibits (Doc. Nos. 49-1–49-6). The defendants again argue that Kelly failed to exhaust his deliberate indifference claims, pointing out that the alleged conduct took place in 2017, but Kelly did not file grievances regarding his mental health treatment after 2016. (Doc. No. 49.) The defendants also argue that Kelly's claims fail on the merits because his mental illness was not sufficiently serious to support an Eighth Amendment claim and that, regardless, neither Dr. Kulenovic nor Hinds was deliberately indifferent to Kelly's mental health needs. (*Id.*) Finally, the defendants argue that Kelly's claims against them are time-barred. (*Id.*)

Kelly responded in opposition to the defendants' motion for summary judgment (Doc. No. 53) but did not respond to their statement of undisputed material facts. Kelly argues that the grievances he filed in 2016 exhausted his claims and, alternatively, that he did not file a formal grievance in 2017 because he had been instructed that grievances regarding medical care were inappropriate to the grievance procedure. (*Id.*) Kelly further argues that Dr. Kulenovic ignored his serious mental health condition. (*Id.*) Dr. Kulenovic and Hinds reply that Kelly did not respond to their statement of undisputed material facts and has not identified any factual dispute that would warrant a trial. (Doc. No. 54.)

## II.     Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

## III. Analysis

### A. Proper Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies "is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. The purposes of exhaustion "include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules'—rules that are defined not by the PLRA, but by the prison grievance process itself." *Id.* at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

Although the PLRA's exhaustion requirement "is a strict rule," it is subject to an exception. *Does 8–10 v. Snyder*, 945 F.3d 951, 962 (6th Cir. 2019). "'Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.'" *Id.* (alteration in original) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016)). An administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 962–63 (quoting *Ross*, 136 S. Ct. at 1859). Conversely, an administrative remedy is not available when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates[;]"the "administrative scheme . . . [is] so opaque that it becomes, practically speaking, incapable of use[;]" or "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60.

Failure to exhaust is an affirmative defense under the PLRA and defendants have "the burden to plead and prove [it] by a preponderance of the evidence." *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015). To prevail on their exhaustion argument at summary judgment in this case, the defendants must establish "that no reasonable jury could find that [Kelly] exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)). If the defendants "put forth evidence" establishing that Kelly failed to exhaust his claims, Kelly must then "present 'significant probative evidence' to defeat the motion for summary judgment on this ground." *Napier v. Laurel Cty.*, 636 F.3d 218, 225 (6th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Dr. Kulenovic and Hinds rightly argue that the grievances Kelly filed in 2016 did not exhaust the deliberate indifference claims he brings against them in this lawsuit for conduct that

took place in 2017.[12] Kelly's claims in this case are based on allegations that Dr. Kulenovic ignored his mental health needs by placing him in four-point restraints rather than referring him to a doctor or transferring him to another facility and that Hinds allowed Kelly to be placed in harsh supermax confinement at MCCC—all acts that had not yet taken place when Kelly filed his 2016 grievances. Because the 2016 grievances predate the conduct relevant to Kelly's claims, they could not exhaust those claims. *See Hoosier v. Liu*, No. 2:16-10688, 2017 WL 7262956, at *5 (E.D. Mich. Oct. 30, 2017) (finding that grievance relating "solely to conduct predating" the alleged insufficient medical treatment could not exhaust deliberate indifference claim against doctor), *report and recommendation adopted by* 2018 WL 646680 (E.D. Mich. Jan. 31, 2018). Kelly did file at least one formal grievance in 2017, but it did not address his mental health treatment. Instead, Kelly's March 20, 2017 grievance concerned Dr. Kulenovic's alleged racial bias in preventing him from keeping property.[13] Finally, Kelly did not file any grievances regarding the medical care he received after he was transferred to MCCC.[14] (Doc. No. 38-1.)

---

[12]    Kelly does not specify whether he has sued Dr. Kulenovic and Hinds in their individual or official capacities and the defendants do not address this ambiguity in any of their filings. Kelly's complaint is construed as asserting only individual-capacity claims against Dr. Kulenovic and Hinds. Kelly has requested monetary damages, his allegations do not reference the defendants by their official titles, and the lack of a sovereign immunity argument in the defendants' dispositive motions indicates that they construed Kelly's complaint as asserting only individual-capacity claims. *See Cass v. City of Dayton*, 770 F.3d 368, 374 n.2 (6th Cir. 2014) (construing plaintiff's unlabeled claim against defendant as an individual-capacity claim where defendant did not object to the complaint's ambiguity and had sufficient notice that he was being sued in his individual capacity).

[13]    Kelly did address Dr. Kulenovic's care in his March 28, 2017 letter to her in which he accused her of ignoring the Unit 4 therapist's requests that he be raised to LOC III. But, under TDOC Policy # 501.01—which was in place at RMSI and MCCC—grievances must be filed using the standard form CR-1394, and Kelly's letter thus did not constitute a formal grievance. (Doc. No. 49-4.)

[14]    The only grievance that Kelly filed at MCCC is dated September 21, 2017, and concerned "unit management[.]" (Doc. No. 38-1, PageID# 182.)

Because the defendants have produced evidence showing that Kelly failed to exhaust his claims against them, Kelly must point to significant probative evidence to show that he did exhaust his grievances or that administrative exhaustion was not available to him. Kelly has met that burden.

Kelly argues that he did not file formal grievances addressing issues relating to his medical care in 2017 because he had been told in 2016 that grievances regarding "a diagnosis by medical professionals and medical co-pay [are] inappropriate" under TDOC Policy # 501.01. (Doc. No. 53, PageID# 306–07.) TDOC Policy # 501.01 provides that "[t]he grievance process is inappropriate for . . . [d]iagnoses by medical professionals, medical co-payments where Policy # 113.15 has been adhered to, and requirements of substance abuse therapeutic programs." (Doc. No. 49-4, PageID# 261.) To show that TDOC Policy # 501.01 made administrative exhaustion unavailable to him, Kelly points to his June 24, 2016 grievance, which was denied a hearing at level two of the review process on the ground that "[a] diagnosis by medical professional & medical co-pay is inappropriate. (501.01 VI H.8)." (Doc. No. 45-1, PageID# 211.) Kelly also points to the March 28, 2017 letter he wrote to Dr. Kulenovic in lieu of filing a formal grievance. (Doc. No. 45-1.) Kelly states that, because his 2016 grievances addressing his medical care were never fully processed, he did not file any more formal grievances addressing his medical treatment at RMSI or MCCC.

Based on these facts, a reasonable jury could find that administrative remedies were not available to address the mental health care Kelly received at RMSI and MCCC. "The non-grievability of [a claim] through the grievance process makes that remedy unavailable under the PLRA . . . ." *Owens v. Keeling*, 461 F.3d 763, 769 (6th Cir. 2006). Accordingly, when a grievance system has a "'flat rule' against medical grievances[,]" an incarcerated person is not required to

exhaust claims relating to medical care. *Rancher v. Franklin Cty.*, 122 F. App'x 240, 242 (6th Cir. 2005) (quoting *Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir. 1999)).

That RMSI considered TDOC Policy # 501.01 to be just such a "flat rule" is made clear by the August 22, 2016 letter from RMSI Grievance Chairperson McClure to Kelly regarding his unprocessed grievances. (Doc. No. 17.) In that letter, McClure instructed Kelly that "[g]rieving a medical diagnosis is inappropriate to the grievance procedure. The grievance board cannot review, decide on, or make recommendations in regards to any medical related grievance." (*Id.* at PageID# 84.) More importantly, McClure told Kelly that he "should consider this issue resolved" and that Kelly could "use [his] previous grievance and this unprocessed grievance as evidence that [he has] exhausted [his] state remedies." (*Id.*) McClure's letter plainly shows that TDOC Policy # 501.01 operated "as a simple dead end" for medical-related grievances, with administrators "unable or consistently unwilling" to provide relief and that RMSI officials considered no other avenues of administrative exhaustion to be available for Kelly's claims.[15] *Ross*, 136 S. Ct. at 1859.

Dr. Kulenovic and Hinds do not address Kelly's argument concerning the unavailability of the grievance procedure for medical-related grievances. Instead, they reiterate their argument that none of the grievances Kelly filed was sufficient to exhaust administrative remedies. (Doc. No. 54.) But the defendants "cannot now assert that [Kelly] failed to exhaust the grievance process

---

[15]     There is some evidence in the record suggesting that not all grievance administrators were opposed to providing relief for medical-related grievances. Collins responded to the June 24, 2016 and June 30, 2016 grievances on the merits. And, on appeal, the deputy commissioner affirmed Collins's response to the June 24, 2016 grievance at the third level. But even if these responses show some ambiguity in the way individual officials handled medical grievances, Kelly reasonably relied on McClure's representation that he should no longer file grievances on medical issues. *Ross*, 136 S. Ct. at 1860; *see also Does 8–10*, 945 F.3d at 965 ("An administrative remedy is not 'available,' and therefore need not be exhausted, if prison officials . . . inaccurately describe the steps [an inmate] needs to take to pursue it." (alteration in original) (quoting *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011)).

after [he was] told that his issues were nongrievable." *White v. Jindal*, No. 13-15073, 2014 WL 2864191, at *11 (E.D. Mich. June 24, 2014); *see also Adkins v. Lewis*, No. 4:18CV-P24, 2019 WL 4452955, at *5 (W.D. Ky. Sept. 17, 2019) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure." (alteration in original) (citation omitted)). It is the defendants' burden to demonstrate that administrative remedies were available to Kelly. *See Lee*, 789 F.3d at 677. Because they have failed to meet that burden here, summary judgment is not appropriate on exhaustion grounds.

### B. Kelly's Deliberate Indifference Claims

"Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 1983). The Eighth Amendment, which applies to state governments through the Fourteenth Amendment, "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Berkshire v. Beauvais*, 928 F.3d 520, 535 (6th Cir. 2019) (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004)). Dr. Kulenovic and Hinds do not dispute that they acted under color of state law, and so the only question presented by their motion for summary judgment is whether there is a genuine dispute of material fact that they violated Kelly's Eighth Amendment rights.

A deliberate indifference claim against an individual defendant has subjective and objective components. To satisfy the objective component, Kelly must establish that his medical needs were "sufficiently serious" when his rights were allegedly violated. *Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[A]

medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (emphasis in original) (quoting *Blackmore*, 390 F.3d at 897). "[P]sychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

The subjective component serves "'to prevent the constitutionalization of medical malpractice claims[.]'" *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014) (quoting *Comstock*, 273 F.3d at 703). To satisfy it, Kelly must show more than mere negligence—he must establish "that each defendant acted with a mental state 'equivalent to criminal recklessness.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)). "This showing requires proof that each defendant 'subjectively perceived facts from which to infer substantial risk to [Kelly], that [each defendant] did in fact draw the inference, and that [each defendant] then disregarded that risk' by failing to take reasonable measures to abate it." *Id.* (quoting *Comstock*, 273 F.3d at 703). The Court analyzes the subjective component of a deliberate indifference claim separately for each defendant. *Winkler v. Madison Cty.*, 893 F.3d 877, 891 (6th Cir. 2018).

Dr. Kulenovic and Hinds have failed to demonstrate the absence of a genuine factual dispute concerning the objective component of Kelly's deliberate indifference claims. However, summary judgment is ultimately appropriate because there is no evidence in the record to support a finding that either Dr. Kulenovic or Hinds disregarded a substantial risk of harm to Kelly.

### 1. Kelly's Mental Health Needs Were Sufficiently Serious

The defendants have failed to meet their initial burden of demonstrating the absence of a factual dispute regarding the seriousness of Kelly's mental health needs. Dr. Kulenovic and Hinds argue only that Kelly's mental illness was not objectively serious because he was classified as

LOC II while at RMSI. (Doc. No. 49.) According to the defendants, only people classified as LOC III have a "serious" mental illness for purposes of the Eighth Amendment. (*Id.* at PageID# 240.) This argument is not supported by any citation of legal authority and carries little weight. First, it does not acknowledge Kelly's argument that he was wrongfully classified as LOC II at RMSI, and it ignores the fact that Kelly was classified as LOC III when he arrived at MCCC. Further, there is no evidence that TDOC classifications are made based on constitutional standards, and they do not bind the Court.

The evidence in the record—most of which the defendants provided—shows that, during the relevant period, Kelly's mental illness was sufficiently serious to satisfy the objective component of an Eighth Amendment claim. Although Kelly's exact diagnosis is not established by the record, his complaint references extreme episodes of schizophrenia, and his June 24, 2016 grievance mentions bipolar disorder. In 2016 and early 2017, Kelly was taking a psychotropic medication that made it difficult for him to wake up in the mornings, and that medication was prescribed and monitored by a psychiatrist. This evidence establishes that Kelly was suffering from a mental illness "that ha[d] been diagnosed by a physician as mandating treatment[.]" *Richmond*, 885 F.3d at 943 (quoting *Blackmore*, 390 F.3d at 897). Kelly's repeated episodes of cutting at RMSI also indicate serious mental illness that would have been obvious to a lay person. *See id.* at 938; *see also Bays v. Montmorency Cty.*, 874 F.3d 264, 268 (6th Cir. 2017) (holding that a jury could conclude that incarcerated person's mental illness was sufficiently serious where his symptoms included "paranoia, anxiety, anger, troubling thoughts, [and] self-destructive wall punching . . ." that "a reasonable nurse would [have] recognize[d]" required medical attention). Neither relevant legal authority nor the evidence in the record supports the defendants' argument that Kelly's mental health needs were insufficiently serious to trigger the Eighth Amendment. The

defendants have failed to demonstrate the absence of a triable factual dispute with respect to the objective component of Kelly's Eighth Amendment claim, and therefore their motion for summary judgment on this front fails.

### 2. Dr. Kulenovic Did Not Disregard a Substantial Risk of Harm to Kelly

The record shows that Dr. Kulenovic was aware that Kelly faced a substantial risk of harm. Kelly cut himself twice while Dr. Kulenovic was clinical director of RMSI, and Dr. Kulenovic assessed Kelly after each episode and placed him on suicide watch. Kelly also detailed his mental health history to Dr. Kulenovic in his March 28, 2017 letter, including his record of mental illness and self-mutilation. Based on those facts, a jury could conclude that Dr. Kulenovic was aware that Kelly's mental illness and self-destructive behavior created a substantial risk of harm to him. *See Bays*, 874 F.3d at 268 (holding that jury could conclude that jail nurse was aware of substantial risk of harm to incarcerated person who ultimately killed himself where nurse had recorded his symptoms, recommended that he receive emergency treatment, and later admitted that he should have been placed on a watch list).

The question thus becomes whether Dr. Kulenovic disregarded that risk of harm. Kelly alleges that Dr. Kulenovic did so by placing him in four-point restraints rather than referring him to another doctor or transferring him to a facility where he could receive better care. In his March 28, 2017 letter, Kelly further alleges that Dr. Kulenovic ignored the requests of the Unit 4 therapist that Kelly be raised to a LOC III. Dr. Kulenovic argues that she responded reasonably to Kelly's mental illness, regularly monitoring him and placing him on suicide watch, and that Kelly's desire for different treatment than what he received cannot form the basis of an Eighth Amendment claim.

Dr. Kulenovic points to multiple treatment records to support her position that she responded reasonably to Kelly's mental illness. On January 2, 2017, Dr. Kulenovic informed Kelly that she would speak with the psychiatrist and APN regarding a potential adjustment to Kelly's

24

medication. A week later, in a pre-segregation screening of Kelly, she encouraged him to make a sick-call request if he had any concerns about his mental health. On February 15, 2017, a day after Collins had placed Kelly on suicide watch, Dr. Kulenovic continued that placement because Kelly was still thinking about harming himself. Five days later, Dr. Kulenovic and an APN assessed Kelly after he had cut himself and been placed on suicide watch for a second time. Dr. Kulenovic maintained Kelly's suicide-watch placement because he continued to have thoughts of self-harm. On March 5, 2017, Kelly was immobilized with four-point restraints and placed back on suicide watch after he reported that he had cut himself. Dr. Kulenovic assessed Kelly later that day and continued the suicide watch. Dr. Kulenovic assessed Kelly again on April 14, 2017, noting that his psychological exam was normal and that he planned to continue participating in individual therapy. Dr. Kulenovic assessed Kelly for the last time on June 1, 2017, at the infirmary, where Kelly had been placed for therapeutic seclusion. Dr. Kulenovic noted that, although Kelly exhibited psychiatric stability at that time, he had been raised to a LOC III and was awaiting transfer to MCCC.

Even viewed in the light most favorable to Kelly, the evidence that Dr. Kulenovic has identified shows no genuine issue of material fact that she disregarded a substantial risk of harm to him. Dr. Kulenovic coordinated Kelly's care with a psychiatrist and APNs and regularly monitored his condition. *See Chapman v. Cumberland Cty.*, No. 2:10-0063, 2011 WL 1303288, at *2 (M.D. Tenn. Apr. 5, 2011) (finding that plaintiff failed to establish deliberate indifference where affirmative evidence showed that "medical care was routinely provided to the [incarcerated] plaintiff . . . , including regular examinations and monitoring of his condition, . . . placement on suicide watch, and the consistent provision of prescription medications to him for his mental illness"), *report and recommendation adopted by* 2011 WL 1642006 (M.D. Tenn. Apr. 29, 2011).

Further, in the aftermath of Kelly's episodes of self-mutilation, Dr. Kulenovic kept him on suicide watch so that he would be closely observed. *See Rouster*, 749 F.3d at 449 (holding that registered medical assistant was not deliberately indifferent to incarcerated person's mental health needs where assistant placed him in an "observation cell where he could be closely monitored" after witnessing him drinking from a toilet). The record of Dr. Kulenovic's treatment does not show that she departed from the procedures typically used to evaluate and treat suicide risk. *Cf. Comstock*, 273 F.3d at 709 (holding that prison psychologist was not entitled to summary judgment on deliberate indifference claim against him where he had released incarcerated person who ultimately killed himself from suicide watch without performing any "of the tasks that . . . other psychologists testified would be 'routinely' conducted by them in evaluating a known suicide risk"). Nor is there any indication that she acted with malice in treating Kelly. *Cf. Berkshire*, 928 F.3d at 535–36 (holding that prison psychologist was not entitled to qualified immunity on deliberate indifference claim where he had denied suicidal plaintiff's request to go into a crisis stabilization program because the psychologist did not want to complete the necessary paperwork and had previously expressed that he hoped the plaintiff would die).

Because Dr. Kulenovic has produced evidence that she did not disregard a substantial risk of harm to Kelly, he must point to evidence that would enable a jury to draw the opposite conclusion. He has not met that burden. Kelly did not respond to the defendants' statement of undisputed material facts despite being warned of the consequences of failing to do so. (Doc. No. 32.) Kelly's argument in opposition consists primarily of the unsworn and conclusory allegation that Dr. Kulenovic ignored his condition by opting to place him in four-point restraints rather than refer him to another doctor or transfer him to a more appropriate facility. But there is nothing in the record to support the inference that Dr. Kulenovic, as clinical director, was capable

of transferring Kelly to another facility, and the record shows that Dr. Kulenovic was working with a psychiatrist to coordinate Kelly's care. More importantly, at the summary judgment stage, Kelly's unsworn allegations cannot create a triable factual dispute. *See Evans v. Vinson*, 427 F. App'x 437, 442 (6th Cir. 2011) (holding that pro se plaintiff's unsworn response in opposition to motion for summary judgment did not constitute evidence that could be considered in resolving that motion); *see also Chapman*, 2011 WL 1303288, at *2 (finding that incarcerated plaintiff's conclusory allegation that defendants ignored his mental illness could not survive motion for summary judgment supported by "affirmative evidence" showing that plaintiff routinely received medical care and was placed on suicide watch). Although Kelly filed the March 28, 2017 letter to Dr. Kulenovic, in which he alleges that she ignored the Unit 4 therapist's requests that Kelly be raised to LOC III, there is nothing in the record to corroborate that allegation.[16] Instead, the record shows that, within about two months of sending the letter, Kelly had been raised to LOC III and was awaiting transfer to MCCC. It is clear that Kelly is not satisfied with the medical care he received at RMSI but, in the absence of a showing that Dr. Kulenovic responded unreasonably to the risk of harm that he faced, that dissatisfaction cannot support a deliberate indifference claim against her. *See Berkshire*, 928 F.3d at 536 (finding that "courts generally do not second guess the judgment of prison medical officials" unless they render grossly inadequate care or decide to take an easier but less efficacious course of treatment). Dr. Kulenovic is entitled to summary judgment.

---

[16]    The record suggests that Dr. Kulenovic could not unilaterally change Kelly's LOC. Under Policy # 113.87, "[a]n inmate's level of care can only be reduced or increased after the Mental Health Treatment Team has reviewed the inmate's history and mental status." (Doc. No. 49-5, PageID# 272.) Further, "[i]f the inmate is being treated with psychotropic medication, a psychiatrist or APN shall be part of the decision making process." (*Id.*) Because Kelly was being treated with psychotropic medication, either a psychiatrist or an APN would have had a say in determining Kelly's LOC.

### 3. Hinds Did Not Disregard a Substantial Risk of Harm to Kelly

Hinds is also entitled to summary judgment. Hinds argues that Kelly's only allegation against her—that she placed Kelly in harsh supermax confinement despite knowing that such confinement was inappropriate for him—is insufficient to establish that she was deliberately indifferent to Kelly's mental health needs. Hinds filed a document from MCCC showing that Kelly was seen by Dr. Olroyd on August 18, 2017, for a 72-hour follow-up after being admitted to the infirmary. (Doc. No. 49-6.) In response to Kelly's concern that being in the SLU would be harmful to his mental state, Dr. Olroyd encouraged Kelly to give the treatment a chance. (*Id.*) Dr. Olroyd noted that Kelly would continue to be monitored "per SLU policy[.]" (*Id.* at PageID# 295.)

The August 18, 2017 document does not mention Hinds, and there is no evidence concerning Hinds's treatment of Kelly in the record. Because Hinds has shown that Kelly has introduced no evidence to substantiate a claim against her, Kelly must respond with evidence sufficient to create a triable fact. *See Celotex Corp.*, 477 U.S. at 325. But Kelly does not address any of Hinds's arguments. Kelly's lone, conclusory, and unsworn allegation against Hinds is insufficient to establish a genuine dispute as to any material fact. Hinds is entitled to summary judgment on Kelly's claim against her.

Given that summary judgment is appropriate on these grounds, the Court need not consider the alternative argument that Kelly's claims against Dr. Kulenovic and Hinds are untimely.

## IV. Recommendation

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Dr. Kulenovic and Hinds's motion for summary judgment (Doc. No. 48) be GRANTED and that judgment be entered in their favor. The Magistrate Judge further RECOMMENDS that Hinds's motion for judgment on the pleadings (Doc. No. 35); Dr. Kulenovic and Hinds's motion for judgment on the pleadings

(Doc. No. 37); and Kelly's motion for judgment on the pleadings (Doc. No. 42), which is really a response to the defendants' motions, be FOUND MOOT.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 18th day of February, 2020.

ALISTAIR E. NEWBERN
United States Magistrate Judge